VANASKIE, Circuit Judge,
dissenting.
While Congress “has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.” New York v. United States, 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (emphasis added). Concluding that the Professional and Amateur Sports Protection Act (“PAS-PA”), 28 U.S.C. § 3701 et seq., was a congressional command that States must prohibit wagering on sporting events because it forbids the States from “authorizing] by law” such activity, I dissented from the holding in Christie I that PASPA was a valid exercise of congressional authority. National Collegiate Athletic Ass’n v. Governor of New Jersey (Christie I), 730 F.3d 208, 241-51 (3d Cir. 2013) (Vanaskie, J., dissenting). My colleagues in the majority in Christie I disagreed with my conclusion because they believed that States had the option of repealing existing bans on sports betting. Id. at 232. In upholding PASPA, Christie I rejected New Jersey’s argument that a repeal of its ban on sports betting would be viewed as effectively “authorizing] by law” this activity. Christie I declared that New Jersey’s “attempt to read into PASPA a requirement that the states must affirmatively keep a ban on sports gambling in their books rests on a false equivalence between repeal and authorization.” Id. at 233.1 viewed that “false equivalence” assertion with considerable skepticism. Id. at 247 n. 5 (“[I]t certainly is open to debate whether a state’s repeal of a ban on sports gambling would be akin to that state’s ‘authorizing’ gambling on sporting events.... ”). My skepticism is validated by today’s majority opinion. The majority dodges the inevitable conclusion that PAS-PA conscripts the States to prohibit wagering on sports by suggesting that some partial repeal of the ban on sports gambling would not be tantamount to authorization of gambling.
Implicit in today’s majority opinion and Christie I is the premise that Congress lacks the authority to decree that States must prohibit sports wagering, and so both majorities find some undefined room for States to enact partial repeals of existing bans on sports gambling. While the author *407 of Christie I finds that New Jersey’s partial repeal at issue here is not the equivalent of authorizing by law wagering on sporting events, today’s majority concludes otherwise. This shifting line approach to a State’s exercise of its sovereign authority is untenable. The bedrock principle of federalism that Congress may not compel the States to require or prohibit certain activities cannot be evaded by the false assertion that PASPA affords the States some undefined options when it comes to sports wagering. Because I believe that PASPA was intended to compel the States to prohibit wagering on sporting events, it cannot survive constitutional scrutiny. Accordingly, as I did in Christie I, I dissent.
I.
According to the majority, “a state’s decision to selectively remove a prohibition on sports wagering in a manner that permissively channels wagering activity to particular locations or operators is, in essence, ‘authorization’ under PASPA.” Maj. Op., at 401. The majority also claims “a state’s partial repeal of a sports wagering ban to allow de minimis wagers between friends and family would not have nearly the type of authorizing effect that we find in the 2014 Law.” Id. at 402. Thus, according to the majority, the 2014 Law is a partial repeal that is foreclosed by PASPA, but “other options may pass muster” because “not all partial repeals are created equal.” Id.
Noticeably, the majority does not explain why all partial repeals are not created equal or explain what distinguishes the 2014 Law from those partial repeals that pass muster. To further complicate matters, the majority continues to rely on Christie I, which did “not read PASPA to prohibit New Jersey from repealing its ban on sports wagering” and informed New Jersey that “[n]othing in [PASPA’s] words requires that the states keep any law in place.” 730 F.3d at 232.
A.
Christie I “[r]ecogniz[ed] the importance of the affirmative/negative command distinction,” and “agree[d] with [New Jersey] that the affirmative act requirement, if not properly applied, may permit Congress to ‘accomplish exactly what the commandeering doctrine prohibits’ by stopping the states from ‘repealing an existing law.’ ” 730 F.3d at 232 (quoting Conant v. Walters, 309 F.3d 629, 646 (9th Cir. 2002) (Kozinski, J., concurring)). Christie I, however, discounted concerns regarding PAS-PA’s affirmative act requirement because Christie I “d[id] not read PASPA to prohibit New Jersey from repealing its ban on sports wagering.” Id. According to Christie I, PASPA is constitutional because “[n]othing in [PASPA’s] words requires that the states keep any law in place.” Id. This conclusion formed the premise for the conclusion in Christie I that PASPA passed constitutional muster.
Remarkably, the majority chooses to “excise that discussion from our prior opinion as unnecessary dicta.” Maj. Op., at 401. This cannot be the case, however, because that discussion was the cornerstone of the holding in Christie I. See In re McDonald, 205 F.3d 606, 612 (3d Cir. 2000) (“Chief Judge Posner has aptly defined dictum as ‘a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding — that, being peripheral, may not have received the full and careful consideration of the court that uttered it.’ ” (quoting Sarnoff v. Am. Home Prods. Corp., 798 F.2d 1075, 1084 (7th Cir. 1986))).
Indeed, to rationalize its conclusion in Christie I, the Christie I majority had to expressly reject the notion that when a *408 state “choose[s] to repeal an affirmative prohibition of sports gambling, that is the same as ‘authorizing’ that activity, and therefore PASPA precludes repealing prohibitions on gambling just as it bars affirmatively licensing it.” 730 F.3d at 232. This aspect of Christie I was not peripheral to the ultimate holding because Christie I specifically “agree[d] with [New Jersey] that the affirmative act requirement, if not properly applied, may permit Congress to ‘accomplish exactly what the commandeering doctrine prohibits’ by stopping the states from ‘repealing an existing law.’ ” Id. (quoting Conant, 309 F.3d at 646 (Kozinski, J., concurring)). Thus, to resolve the issue before it, Christie I necessarily had to give this issue the “full and careful consideration of the court.” In re McDonald, 205 F.3d at 612 (quoting Sarnoff, 798 F.2d at 1084).
In giving the issue its full and careful consideration, Christie I explained that the notion that a “repeal” could be the same as an “authorization” was “problematic in numerous respects.” 730 F.3d at 232; see also id. (“Most basically, it ignores that PASPA speaks only of ‘authorizing by law’ a sports gambling scheme.”). Christie I did “not see how having no law in place governing sports wagering is the same as authorizing it by law.” Id. Christie I recognized a distinction between affirmative commands for actions and prohibitions, and explained that there was “a false equivalence between repeal and authorization.” Id. at 233. Thus, as a matter of statutory construction, and to avoid “a series of constitutional problems,” Christie I specifically held that if the Court did not distinguish between “repeals” (affirmative commands) and “authorizations” (affirmative prohibitions), the Court would “read[ ] the term ‘by lav/ out of [PASPA].” Id. at 233.
I dissented from that opinion because “any distinction between a federal directive that commands states to take affirmative action and one that prohibits states from exercising their sovereignty is illusory.” 730 F.3d at 245 (Vanaskie, J., concurring in part and dissenting in part). The decision to base Christie I on a distinction between affirmative commands for action and affirmative prohibitions was “untenable,” because “affirmative commands to engage in certain conduct can be rephrased as a prohibition against not engaging in that conduct.” Id. As I explained, basing Christie I on such an illusory distinction raises constitutional concerns because “[a]n interpretation of federalism principles that permits congressional negative commands to state governments will eviscerate the constitutional lines drawn” by the Supreme Court. Id.
B.
After Christie I, a state like New Jersey at least had the choice to either “repeal its sports wagering ban,” or, “[o]n the other hand ... keep a complete ban on sports gambling.” Id. at 233 (majority opinion). The Christie I majority found that this choice was not too coercive because it left “much room for the states to make their own policy” and left it to a State “to decide how much of a law enforcement priority it wants to make of sports gambling, or what the exact contours of the prohibition will be.” Id.
Today’s majority makes it clear that PASPA does not leave a State “much room” at all. Indeed, it is evident that States must leave gambling prohibitions on the books to regulate their citizens. A review of the four Supreme Court anti-commandeering cases referenced by the majority is illuminating.
1.
The first two anti-commandeering cases that the majority reviews are Hodel v. *409 Virginia Surface Mining & Reclamation Ass’n, Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), and F.E.R.C. v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). As the majority points out, these cases address “permissible regulation in a pre-emptible field.” Maj. Op., at 399. In analyzing these eases, however, the majority overlooks the main rule announced by the Supreme Court in situations where there is an exercise of legislative authority under the Commerce Clause or where Congress preempts an area with federal legislation within its legislative power. In such situations, States have a choice: they may either comply with the federal legislation or the Federal Government will carry the legislation into effect.
This rule was announced in Hodel, where the Supreme Court explained that “[i]f a State does not wish to ... eompl[y] with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government.” 452 U.S. at 288, 101 S.Ct. 2352 (emphasis added). The same theme repeated itself in F.E.R.C., as the Supreme Court focused on “the choice put to the States — that of either abandoning regulation of the field altogether or considering the federal standards.” 456 U.S. at 766, 102 S.Ct. 2126 (emphasis added). In both cases, the Supreme Court was clear that there must be some choice for the states to make because without it “the accountability of both state and federal officials is diminished.” New York v. United States, 505 U.S. 144, 168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).
Indeed, in New York v. United States, the Court explained that a State’s view on legislation “can always be pre-empted under the Supremacy Clause if it is contrary to the national view, but in such a case ... it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular.” Id. at 168, 112 S.Ct. 2408. The Supreme Court reiterated this point Printz v. United States, explaining that, “[b]y forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for ‘solving’ problems without having to ask their constituents to pay for the solutions with higher federal taxes.” 521 U.S. 898, 930, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). Thus, States must be given a choice because the Supreme Court is concerned that “it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.” New York, 505 U.S. at 169, 112 S.Ct. 2408.
As the majority explains, while “PAS-PA’s provisions and its reach are controversial (and, some might say, unwise).... we are duty-bound to interpret the text of the law as Congress wrote it.” Maj. Op., at 396. Because the majority has excised the distinction between a repeal and an authorization, the majority makes it clear that under PASPA as written, no repeal of any kind will evade the command that no State “shall ... authorize by law” sports gambling. 28 U.S.C. § 3702. In the face of such a congressional directive, “no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.” Printz, 521 U.S. at 935,117 S.Ct. 2365.
2.
This leads to the other two anti-eom-mandeering cases reviewed by the majority: South Carolina v. Baker, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), and Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). The majority explains that these cases address permissi *410 ble “prohibitions on state action.” Maj. Op., at 399. Again, however, the majority seems to overlook the animating factor for each of these opinions. In both Baker and Reno the Supreme Court explained that permissible prohibitions regulated State activities. The Supreme Court has never sanctioned statutes or regulations that sought to control or influence the manner in which States regulate -private parties.
For example, in Baker, the Supreme Court reviewed a challenge to the Internal Revenue Code’s enactment of § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, which prohibited States from issuing unregistered bearer bonds. Notably, when reviewing the case, the Court specifically found that it did not need to address “the possibility that the Tenth Amendment might set some limits on Congress’ power to compel States to regulate on behalf of federal interests” because the Court found that the commandeering concerns “in FERC [were] inapplicable to § 310.” Baker, 485 U.S. at 513, 108 S.Ct. 1355. Importantly, the Court distinguished § 310 from the statute in F.E.R.C. because the Court found that “Section 310 regulates state activities; it does not, as did the statute in FERC, seek to control or influence the manner in which States regulate private parties.” Id. at 514, 108 S.Ct. 1355. Similarly, in Reno, the Court addressed a statute that did not require (1) “the States in their sovereign capacity to regulate their own citizens,” (2) “the ... Legislature to enact any laws or regulations,” or (3) “state officials to assist in the enforcement of federal statutes regulating private individuals.” 528 U.S. at 151, 120 S.Ct. 666. It was only on these bases that the Supreme Court found the statute at issue in Reno was “consistent with the constitutional principles enunciated in New York and Printz.” Id.
Unlike the statutes at issue in Baker and Reno, however, PASPA seeks to control and influence the manner in which States regulate private parties. Through PASPA, Congress unambiguously commands that “[i]t shall be unlawful for ... a governmental entity to ... authorize by law” sports gambling. 28 U.S.C. § 3702. By issuing this command, Congress has set an impermissible “mandatory agenda to be considered in all events by state legislative or administrative decisionmakers.” F.E.R.C., 456 U.S. at 769, 102 S.Ct. 2126.
3.
The logical extension of the majority is that PASPA prevents States from passing any laws to repeal existing gambling laws. As the majority correctly notes, “[t]he word ‘authorize’ means, inter alia, ‘[t]o empower; to give a right or authority to act,’ or ‘[t]o permit a thing to be done in the future.’ ” Maj. Op., at 396 (quoting Black’s Law Dictionary 133 (6th Ed. 1990)) (footnote omitted). Because authorization includes permitting a thing to be done, it follows that PASPA also prevents state officials from stopping enforcement of existing gambling laws. States must regulate conduct prioritized by Congress. Cf. Co-nant, 309 F.3d at 646 (Kozinski, J., concurring) (“[P]reventing the state from repealing an existing law is no different from forcing it to pass a new one; in either case, the state is being forced to regulate conduct that it prefers to leave unregulated.”).
It is true that civil actions to enjoin a violation of PASPA “may be commenced in an appropriate district court of the United States by the Attorney General of the United States.” 28 U.S.C. § 3703. But it can hardly be said that the United States Attorney General bears the full regulatory burden because, through PASPA, Congress effectively commands the States to *411 maintain and enforce existing gambling prohibitions.[1]
PASPA is a statute that directs States to maintain gambling laws by dictating the manner in which States must enforce a federal law. The Supreme Court has never considered Congress’ legislative power to be so expansive. See Prigg v. Com. of Pennsylvania, 41 U.S. 16 Pet. 539, 541, 10 L.Ed. 1060 (1842) (“It might well be deemed an unconstitutional exercise of the power of interpretation, to insist that the states are bound to provide means to carry into effect the duties of the national government, nowhere delegated or intrusted to them by the constitution”); F.E.R.C., 456 U.S. at 761-62, 102 S.Ct. 2126 (“[T]his Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations ”) (citing E.P.A. v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977)); New York, 505 U.S. at 178, 112 S.Ct. 2408 (“Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.”); Nat’l Fed’n of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2602, 183 L.Ed.2d 450 (2012) (plurality opinion) (“[T]he Constitution has never been understood to confer upon Congress the- ability to require the States to govern according to Congress’ instructions.” (quoting New York, 505 U.S. at 162, 112 S.Ct. 2408)).
II.
It is now apparent that Christie I was incorrect in finding that “nothing in [PAS-PA’s] words requires that the states keep any law in place.” 730 F.3d at 232 (first and third emphasis added). With respect to the doctrinal anchors of Christie I, the cornerstone of its holding has been eroded by the majority, which has excised Christie Ps discussion regarding “a false equivalence between repeal and an authorization.” Id. at 233. Notably, that discussion was included in Christie I to avoid “a series of constitutional problems.” Id. Today’s majority makes it clear that passing a law so that there is no law in place governing sports wagering is the same as authorizing it by law. See Maj. Op., at 396 (“The word ‘authorize’ means, inter alia, ‘[t]o empower; to give a right or authority to act,’ or ‘[t]o permit a thing to be done in the future.’ ”) (citation and footnote omitted).
I dissented in Christie I because the distinction between repeal and authorization is unworkable. Today’s majority opinion validates my position: PASPA leaves the States with no choice. While Christie I at least gave the States the option of repealing, in whole or in part, existing bans on gambling on sporting events, today’s decision tells the States that they must maintain an anti-sports wagering scheme. The anti-commandeering doctrine, essential to protect State sovereignty, prohibits Congress from compelling States to prohibit such private activity. Accordingly, I dissent.

. A refusal to enforce existing laws would be the same as a repeal of existing laws: the States would be authorizing sports wagering,