The STATE OF NEW YORK, the County of Allegany, New York and the County of Cortland, New York, Plaintiffs–Appellants,

v.

The UNITED STATES of America; James D. Watkins, as Secretary of Energy; Kenneth M. Carr, as Chairman of the United States Nuclear Regulatory Commission; the United States Nuclear Regulatory Commission; Samuel K. Skinner, as Secretary of Transportation; and Richard Thornburgh, as United States Attorney General, Defendants–Appellees,

State of Washington; State of Nevada; and State of South Carolina, Intervenors–Appellees,

American College of Nuclear Physicians; Arizona Public Service Company; Baltimore Gas & Electric Company; California Radioactive Materials Management Forum, Inc.; Commonwealth Edison Company; Florida Power & Light Company; Gulf States Utilities Company; Mallinkrodt Medical, Inc.; Pacific Gas & Electric Co.; Public Service Company of Colorado; Society of Nuclear Medicine; Southern California Edison Co., Amici Curiae.

Nos. 1511 to 1513, Dockets 91–6031, 91–6033 and 91–6035.

United States Court of Appeals, Second Circuit.

Argued May 21, 1991.

Decided Aug. 8, 1991.

Peter Schiff, Deputy Sol. Gen., State of N.Y. (Robert Abrams, Atty. Gen., O. Peter Sherwood, Sol. Gen., John McConnell, Asst. Atty. Gen., of counsel) for plaintiff-appellant State of N.Y.

Edward F. Premo, II, Harter, Secrest & Emery, Rochester, N.Y. (Paul D. Sylvestri, of counsel) for plaintiff-appellant County of Allegany, N.Y.

Deborah Goldberg, Berle, Kass & Case, New York City (Michael B. Gerrard, of counsel) for plaintiff-appellant County of Cortland, N.Y.

Jeffrey P. Kehne, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C. (Anne S. Almy and Louise F. Milkman, of counsel) for defendants-appellees.

Allen T. Miller, Jr., Asst. Atty. Gen., State of Washington, Ecology Div., Olympia, Wash. (Kenneth O. Eikenberry, Atty. Gen.) for intervenors-appellees State of Wash. and State of Nev.

James Patrick Hudson, Deputy Atty. Gen., Columbia, S.C. (T. Travis Medlock, Atty. Gen.) for intervenor-appellee State of S.C.

Donald J. Silverman, Newman & Holtzinger, P.C., Washington, D.C. (Patricia A.E. Comella and Steve A. Linick, of counsel) brief submitted for amici curiae in support of appellees.

Before MESKILL, PIERCE and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Plaintiffs-appellants appeal from a judgment entered in the United States District Court for the Northern District of New York (Con. G. Cholakis, *Judge*), dismissing a civil complaint seeking declaratory relief. 28 U.S.C. §§ 2201, 2202. The district court found that the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b–2021j, was not an impermissible affront to state sovereign immunity protected under the Tenth Amendment, and that, absent unequal treatment accorded to the State of New York or a defect in the federal political process, Supreme Court precedent precludes further judicial review of the federal statute. The district court also found no Eleventh Amendment violation and dismissed plaintiffs' remaining challenges as meritless.

For the reasons set forth, we affirm.

## BACKGROUND

More than thirty years ago, Congress sought to engage the states in a partnership venture that would recognize the interests of the several states in the peaceful uses of nuclear energy. Pub.L. No. 86–373, § 1, 73 Stat. 688, codified as amended 42 U.S.C. § 2021. *See English v. General Elec. Co.*, — U.S. —, 110 S.Ct. 2270, 2276, 110 L.Ed.2d 65 (1990) ("In 1959, Congress amended the Atomic Energy Act in order to 'clarify the respective responsibilities ... of the States and the [Federal Government]' ... and generally to increase the States' role."). Under the Atomic Energy Act, the Atomic Energy Commission, predecessor to the Nuclear Regulatory

Commission ("NRC" or "Commission"), was authorized to make agreements with the Governor of any state "providing for discontinuance of the regulatory authority of the Commission" with respect to enumerated nuclear materials and byproducts. 42 U.S.C. § 2021(b).

In 1959, an advisory committee formed at the behest of Governor Nelson A. Rockefeller recommended that New York execute an agreement with the Commission to have the State assume all regulatory control possible under federal law. It should be noted, too, that the advisory committee also recommended at that early date that the State establish a site to store radioactive waste, in part, "to encourage the growth of the atomic industry within the state." Even before the advisory committee's report was issued, the New York State Legislature passed the 1959 Atomic Energy Act, *see* 1959 N.Y. Laws Ch. 41, declaring it to be the State's policy to encourage "development and use of atomic energy for peaceful purposes." New York became a so-called "agreement state" under the federal scheme by 1962. 27 Fed.Reg. 10,419 (1962).

A concern, universally acknowledged, that has accompanied the expansion of the nuclear industry is the storage and disposal of low-level radioactive waste ("LLRW") such as contaminated waste from nuclear reactors, hospitals, research laboratories and pharmaceutical companies. During the 1970's, disturbing problems surrounding safe LLRW disposal reached mammoth proportions and commanded immediate congressional attention. As late as 1978 only three states—Washington, Nevada, and South Carolina—had established sites for LLRW operations; the rest of the country transported radioactive waste to these locations—with obvious risks.

The problem worsened dramatically when Washington and Nevada temporarily closed their sites because of improper handling, transportation and packaging of LLRW, shifting an already herculean task onto the lonely shoulders of South Carolina's Barnwell site. H.R.Rep. No. 314, 99th Cong., 1st Sess., pt. 2 at 17, *reprinted*

*in* 1985 U.S.Code Cong. & Admin.News 2974, 3006. Understandably vexed that sister states were not bearing a fair share of the disposal burden, Washington voters approved a 1980 initiative to ban in-state disposal of LLRW generated outside Washington State. While that initiative was struck as unconstitutional, *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 631 (9th Cir.1982) (citing *Philadelphia v. New Jersey*, 437 U.S. 617, 628, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978)), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), it demonstrated that the LLRW problem was fast becoming acute.

Congress turned its attention to these problems but, at the states' request, and in the interest of federalism, deferred action to allow the formulation of state-based and state-created proposals. 1985 U.S.Code Cong. & Admin.News at 3007. The National Governors' Association ("NGA") spearheaded the effort with a Task Force to review and formulate a coordinated policy on the LLRW issue. Other state-based associations, including The National Conference of State Legislatures and the President's State Planning Council on Radioactive Waste Management, joined the effort. *Id.* Because, in the eyes of the NGA, disposition of low-level waste was largely a state responsibility, the Task Force's first recommendation to Congress was that "each state should accept primary responsibility for the safe disposal of low-level radioactive waste generated within its borders, except for waste generated at federal government facilities." Accordingly, the NGA invited Congress to enact legislation that would (1) authorize states to form interstate regional compacts; (2) eventually allow compact regions to exclude LLRW generated outside the region; and (3) provide for the safe interim storage of LLRW.

Congress complied by enacting the Low-Level Radioactive Waste Policy Act of 1980. 42 U.S.C. §§ 2021b–2021d (the "1980 Act"). Subject to congressional consent, states were authorized to form regional compacts and, after January 1, 1986, to refuse waste generated outside these established regions. Many states apparently

progressed toward the establishment of regional compacts (or individual "go it alone" in-state disposal sites), but the original target date of January 1986 proved unrealistic. The three states that were accepting LLRW, disquieted with frustration, again looked to Congress. The NGA again stepped in to forge a state-based consensus and negotiated a seven-year extension, or "transition package" with the three sited states, buying more time for the regional solutions to become operable. 1985 U.S.Code Cong. & Admin.News at 3008.

Acting on this consensus, Congress adopted elaborate amendments to the 1980 Act, enacting the Low–Level Radioactive Waste Policy Amendments Act of 1985. 42 U.S.C. § 2021b–2021j ("1985 Amendments"). The 1985 Amendments set out a detailed schedule of deadlines ending on January 1, 1996, set forth periodic milestones for site development, and imposed various penalties and surcharges for noncompliance. The penalty that has raised the most hackles is the "take title" provision: states that do not comply "shall take title to the waste, shall be obligated to take possession of the waste, and shall be liable for all damages directly or indirectly incurred … as a consequence." 42 U.S.C. § 2021e(d)(2)(C).

New York has not joined a regional compact. Choosing instead to "go it alone," New York enacted legislation effective July 26, 1986: (1) promulgating standards for site selection; (2) creating a commission to select a site; and (3) authorizing the construction of a LLRW disposal site. *See* 1986 N.Y. Laws Ch. 673. As of 1989, New York, in full compliance with the 1985 federal amendments, has certified that it will be able to store, manage, or dispose of its LLRW after January 1, 1993. *See* N.Y.Pub.Auth.Law § 1854–c (McKinney Supp.1991). To date, New York's commission has designated five potential storage sites in New York, three in Allegany County, two in Cortland County.

In February 1990, the State of New York, joined by the Counties of Allegany and Cortland, brought an action in the United States District Court for the Northern District of New York seeking to declare the 1985 Amendments unconstitutional. They claim that the 1985 Amendments violate the Tenth [1] and Eleventh [2] Amendments, as well as the due process clause of the Fifth Amendment [3] and the guaranty clause of article IV of the United States Constitution.[4] The States of Washington, Nevada and South Carolina, intervening by right, Fed.R.Civ.P. 24(a), joined the federal defendants to uphold the 1985 Amendments. A legion of utility companies, medical groups, and the like also sought to intervene. Their motions were denied, although they were permitted to file a brief as *amici curiae* in support of the intervenors and the federal defendants.

All parties moved or cross-moved for summary judgment. Fed.R.Civ.P. 56(c). In addition, the intervenors joined in defendants' motion to dismiss the complaint. Fed.R.Civ.P. 12(b)(6). After oral argument, the district court read into the record a decision dismissing the complaint. *New York v. United States*, 757 F.Supp. 10

---

1. The Tenth Amendment provides:
   The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
   U.S. Const. amend. X.

2. The Eleventh Amendment provides:
   The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
   U.S. Const. amend. XI.

3. The due process clause of the Fifth Amendment provides that no person shall:
   be deprived of life, liberty, or property, without due process of law;
   U.S. Const. amend. V.

4. The guarantee clause provides:
   The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.
   U.S. Const. art. IV, § 4.

(N.D.N.Y.1990).[5] The district court held that the 1985 Amendments did not violate the Tenth and Eleventh Amendments, and similarly dismissed plaintiffs' claims under the guaranty clause (and, implicitly, the due process clause), finding such claims "inextricably intertwined with the position just made in this decision, and those claims are accordingly dismissed." *Id.* at 13.

Plaintiffs appeal, reiterating the claim that the 1985 Amendments trench upon state sovereign immunity, but they do not press a due process claim on appeal. *See generally South Carolina v. Katzenbach,* 383 U.S. 301, 323–24, 86 S.Ct. 803, 815–16, 15 L.Ed.2d 769 (1966) (states are not "persons" within the meaning of the due process clause and, thus, are not protected by it); *Alabama v. EPA,* 871 F.2d 1548, 1554 (11th Cir.) (state which has toxic waste disposal site has no Fifth Amendment due process right and, therefore, cannot allege defective notice by the EPA), *cert. denied,* —— U.S. ——, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989).

## DISCUSSION

More than a decade ago, the Supreme Court declared that "[n]uclear energy may some day be a cheap, safe source of power or it may not. But Congress has made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 557–58, 98 S.Ct. 1197, 1218–19, 55 L.Ed.2d 460 (1978). Thus, appellants undertake an unusually burdensome task to persuade us that feder-

al disposal site control legislation impinges impermissibly upon state sovereignty. Indeed, one circuit court has already said, "that the [Atomic Energy] Act violates the Tenth Amendment has little basis for support. Congress, through its power to regulate interstate commerce and provide for the national defense and general welfare, clearly can enact legislation governing the use of nuclear energy." *Simmons v. Arkansas Power & Light Co.,* 655 F.2d 131, 135 (8th Cir.1981). We are called upon to review the 1985 Amendments to that same Atomic Energy Act; the amendments are designed to ensure state compliance with a plan for safe LLRW disposal.

The 1985 Amendments declare that, in addition to certain classes of nuclear waste generated by the federal government,

> Each State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of—
>
> (A) low-level radioactive waste generated within the State (other than by the Federal Government) that consists of or contains class A, B, or C radioactive waste as defined by section 61.55 of title 10, Code of Federal Regulations, as in effect on January 26, 1983.

42 U.S.C. § 2021c(a)(1). If a state fails to properly dispose of LLRW, certain penalties ensue:

> If a State (or, where applicable, a compact region) in which low-level radioactive waste is generated is unable to provide for the disposal of all such waste generated within such State or compact region by January 1, 1996, each State in which such waste is generated, upon the

---

**5.** In its written opinion, the district court noted, "[a]t this juncture all parties have moved for summary judgment, and there appear to be no issues of material fact, and the case therefore appears ready for summary treatment by the Court." 757 F.Supp. at 11. The court, however, went on to grant the government's motion to dismiss the complaint. *Id.* at 13; *see* Fed. R.Civ.P. 12(b)(6). It is uncontested that the district court considered documentary evidence and affidavits. Accordingly, we treat the appeal as one from the grant of summary judgment. *Grand Union Co. v. Cord Meyer Dev. Corp.,* 735 F.2d 714, 717 (2d Cir.1984). In reviewing *de novo* and considering the record in the light

most favorable to appellants, we nonetheless fully agree with the court below that there exists no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 177–78 (2d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). That said, we review whether the law was correctly applied. *National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989); *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988) (citing 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2716, at 654 (2d ed. 1983)).

request of the generator or owner of the waste, shall take title to the waste, be obligated to take possession of the waste, and shall be liable for all damages directly or indirectly incurred by such generator or owner as a consequence of the failure of the State to take possession of the waste as soon after January 1, 1996, as the generator or owner notifies the State that the waste is available for shipment.

42 U.S.C. § 2021e(d)(2)(C). It is this penalty provision that triggers the most vigorous constitutional challenges.

Appellants' first contention is that the 1985 Amendments violate the Tenth Amendment. Tenth Amendment analysis must now begin with *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), where the Supreme Court instructed us that "[s]tate sovereign interests ... are more properly protected by the procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." 469 U.S. at 552, 105 S.Ct. at 1018 (overturning *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)). In the intervening years, the Supreme Court has emphasized that the judicial role in evaluating Tenth Amendment challenges is narrowly cabined. *See South Carolina v. Baker*, 485 U.S. 505, 512, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988) (*"Garcia* holds that the limits are structural, not substantive—*i.e.,* that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity."); *see also* Massey, *State Sovereignty and the Tenth and Eleventh Amendments*, 56 U.Chi.L.Rev. 61, 72 (1989) ("In *Garcia*, five justices joined in a majority opinion that, in effect, concluded that if states desire to preserve any aspect of their sovereignty within the federal system they must look to Congress, and not to the courts."); *The Supreme Court, 1987 Term—Leading Cases*, 102 Harv.L.Rev. 143, 228 (1988) (*Baker* "unequivocally repudiat[es] the suggestion that the tenth amendment requires any substantive or qualitative analysis of the national political process").

It is self-evident that virtually every congressional exercise of power under the commerce clause will limit state power over that commerce and, to that extent, will invite state objections under the Tenth Amendment. As the *Garcia* Court observed:

> The fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the "States as States" is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a "sacred province of state autonomy."

*Garcia*, 469 U.S. at 554, 105 S.Ct. at 1019 (quoting *EEOC v. Wyoming*, 460 U.S. 226, 236, 103 S.Ct. 1054, 1060, 75 L.Ed.2d 18 (1983)). Other circuits, including ours, have employed the *Garcia* analysis. *See, e.g., Nevada v. Watkins*, 914 F.2d 1545, 1556 (9th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991); *EEOC v. Vermont*, 904 F.2d 794, 802 (2d Cir.1990) (noting that the *"Garcia–Baker* standard is a very high one"). Quite simply, "[w]ith rare exceptions, ... the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace." *Garcia*, 469 U.S. at 550, 105 S.Ct. at 1017.

Perusing the legislative history of the 1985 Amendments, the conclusion is inescapable that, rather than discovering defects in the political process, both the 1980 Act and its 1985 Amendments are paragons of legislative success, promoting state and federal comity in a fashion rarely seen in national politics. *See* Berkovitz, *Waste Wars: Did Congress "Nuke" State Sovereignty in the Low–Level Radioactive Waste Policy Amendments Act of 1985?*, 11 Harv.Envtl.L.Rev. 437, 474 (1987) [hereinafter *Waste Wars* ] ("Th[e] extensive

state involvement [in the 1980 federal act and 1985 federal amendments] produced substantial benefits for all the states, strongly suggesting that state sovereignty received adequate protection."). With both statutes, the Congress acted only after robust debate and a clearly articulated acceptance of NGA and other state-based recommendations. New York's senior Senator, urging adoption of the final version of the proposed amendments, proclaimed:

> New Yorkers will continue to light some of their lights with nuclear electricity—and their doctors will continue to use life-saving laboratory tests that depend on the use of radioactive materials. So will the citizens of South Carolina—and they will be able to watch New York, and the rest of the Nation, make their own arrangements to dispose of their own low-level radioactive wastes.

131 Cong.Rec. S38,423 (daily ed. Dec. 19, 1985) (statement of Senator Moynihan).

█ Turning specifically to the penalty provision that New York finds so offensive, we reject appellants' allegation that the "take title" provision, which they classify as a last-minute amendment to the House bill added to placate Senate demands, is the product of a grievous defect in the political process. They complain that this provision was not subject to timely scrutiny and committee debate. There is an irony in this grumbling when it is recalled that the Senate Environment and Public Works Committee was the author of the take title provision; it numbers among its members Senator Moynihan of New York. *See also Waste Wars,* 11 Harv.Envtl.L.Rev. at 458 ("The House nonetheless accepted the taking title provision by unanimous vote."). In any event, appellants misperceive the issue. "The political process ensures that laws that unduly burden the States will not be promulgated." *Garcia,* 469 U.S. at 556, 105 S.Ct. at 1020; *see Watkins,* 914 F.2d at 1556–57 ("[T]he tenth amendment does not protect a State from being out-voted in Congress.... Nor can Nevada complain

that its lack of representation on the Conference Committee created a defect in the political process."); *EEOC v. Vermont,* 904 F.2d at 802 ("In any event, the absence of a given legislator or legislators, so long as the legislative body's appropriate procedural rules have been followed, does not mean that the national process leading to the enactment of a given piece of legislation was flawed.").

Appellants raise an alternative objection to the take title provision. Noting that *Garcia* cited *Coyle v. Smith,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911), appellants argue that, even after *Garcia,* the Tenth Amendment imposes *some* substantive limitations upon federal power; and they conclude that the take title provision falls within that forbidden zone. We are not persuaded.

In *Coyle,* the Congress sought to condition Oklahoma's admission into the Union upon Oklahoma's agreement to locate, at least initially, its capital in Guthrie and accept certain limitations upon the State's power to change its seat of government. The Supreme Court found such conditions to be a palpable violation of the Tenth Amendment. *See Coyle,* 221 U.S. at 565, 31 S.Ct. at 689 (that a state's power to locate its own seat of government "could now be shorn ... by an act of Congress would not be for a moment entertained").

In testing the waters surrounding *Garcia's* laconic reference to *Coyle,* the district court perceptively noted that the Supreme Court's central concern in *Coyle* was "equality in dignity and power" among the several states, 221 U.S. at 568, 31 S.Ct. at 690, a concern clearly not at issue here where the motivating engine of both the 1980 Act and 1985 Amendments is identical treatment for all states.

It should also be noted that formal transfer of title to nuclear waste, although usually effected by contract, is not uncommon. *See General Elec. Uranium Management Corp. v. United States Dep't of Energy,* 764 F.2d 896, 898 (D.C.Cir.1985) (Secretary authorized to contract with per-

sons who generate or hold title to nuclear waste, for the transfer of title to the Department of Energy); *Commonwealth Edison Co. v. Allied–General Nuclear Servs.*, 731 F.Supp. 850, 856 (N.D.Ill.1990) (contingency clause in contract between private nuclear generator and private nuclear reprocessing plant requiring the latter, upon noncompliance, to accept title to nuclear waste).

In sum, we are satisfied that the take title provision does not undermine the constitutional structure. Neither does it violate principles of federalism as recently explained in *Garcia;* and "[w]here, as here, the national political *process* did not operate in a defective manner, the Tenth Amendment is not implicated." *Baker,* 485 U.S. at 513, 108 S.Ct. at 1361 (emphasis in original); *see generally International Assoc. of Fire Fighters, Local 2203 v. West Adams County Fire Protection Dist.,* 877 F.2d 814, 821 (10th Cir.1989) (absent agreement between state agency and employees, the Fair Labor Standards Act does not violate the Tenth Amendment by compelling state to compensate employees with overtime pay rather then compensatory time); *Metropolitan Transp. Auth. v. ICC,* 792 F.2d 287, 298 (2d Cir.) (Rail Passenger Service Act, requiring the MTA to "permit the operation of Amtrack trains over its lines" does not violate the Tenth Amendment under *Garcia* or conscript the state to act in a way that unconstitutionally promotes a federal policy), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986).

Appellants, most notably Allegany County, strive to offer alternative grounds for declaring the 1985 Amendments unconstitutional. We are satisfied, however, that the 1985 Amendments do not violate the Eleventh Amendment. *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 14, 109 S.Ct. 2273, 2281, 105 L.Ed.2d 1 (1989) (plurality opinion reasoning "that Congress' authority to regulate commerce includes the authority directly to abrogate States' immunity from suit"); *see id.* at 57,

109 S.Ct. at 2303–04 (White, J., concurring) (agreeing "with the conclusion ... that Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States"); *see also National Foods, Inc. v. Rubin,* 936 F.2d 656, 658–59 (2d Cir.1991) ("The Eleventh Amendment has been interpreted to render states absolutely immune from suit in federal court unless they have consented to be sued in that forum or unless Congress has overridden that immunity by statute."); *Russell v. Dunston,* 896 F.2d 664, 667 (2d Cir.) (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976)), *cert. denied,* — U.S. —, 111 S.Ct. 50, 112 L.Ed.2d 26 (1990). Similarly, we agree with the district court that appellants' argument, anchored in the guarantee clause of article IV, that there is a deprivation of a republican form of government, is analytically indistinct from the arguments supporting sovereign immunity under the Tenth Amendment. *See Baker,* 485 U.S. at 511 n. 5, 108 S.Ct. at 1360 n. 5 ("We use 'the Tenth Amendment' to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution.").

## CONCLUSION

We have considered appellants' remaining arguments, but find them without merit. We conclude, therefore, that the 1985 Amendments pass constitutional muster. Accordingly, we affirm.