STATE of Alaska, Plaintiff,

v.

Ronald H. BROWN, Secretary of Commerce, and Bruce Babbitt, Secretary of the Interior, Defendants,

and

Coalition to Keep Alaska Oil, Northville Industries Corp., Intervenor–Defendants.

No. A92–364 CIV.

United States District Court, D. Alaska.

March 1, 1994.

Ronald G. Birch, J. Geoffrey Bentley, Birch, Horton, Bittner & Cherot, Washington, DC, Stephen Hutchings, Birch, Horton, Bittner & Cherot, Anchorage, AK, for plaintiff State of Alaska.

B.C. Barmann, Bakersfield, CA, for amicus curiae County of Kern.

David M. Glass, Dept. of Justice, Civil Div., Washington, DC, Bruce M. Landon, Dept. of Justice, Environment & Natural Resources Div., Anchorage, AK, for Federal defendants Ronald H. Brown and Manuel Lujan, Jr.

Allan A. Tuttle, Patton, Boggs & Blow, Washington, DC, G. Kent Edwards, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, AK, for intervenor-defendant Coalition to Keep Alaska Oil.

Martin London, David Kornblau, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Saul R. Friedman, Sara E. Heideman, Hedland, Fleischer, Friedman, Brennan & Cooke, Anchorage, AK, for intervenor-defendant Northville Industries, Corp.

## ORDER FROM CHAMBERS

SEDWICK, District Judge.

### I. BACKGROUND

After oil was discovered near Prudhoe Bay on Alaska's northern coast in 1968, a right-of-way for construction of a pipeline across federal land lying between the oil field and the ice-free port of Valdez in southcentral Alaska was sought. At the time, oil pipeline rights-of-way issued by the Secretary of the Interior were limited to a width of 50 feet (plus the pipe diameter) by the terms of § 28 of the Mineral Leasing Act of 1920 ("MLA"), 30 U.S.C. § 185. Construction and maintenance of the proposed 4-foot diameter pipeline would require tracts up to 200 feet wide. The Secretary divided the 200 feet needed between a 54-foot right-of-way and a special land use permit authorizing use of the additional width, but this approach was enjoined as a violation of § 28 of the MLA. *Wilder-*

ness Society v. Morton, 479 F.2d 842 (D.C.Cir.1973), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

In *Wilderness Society,* Judge Skelly Wright pointed out that control over the use of federal property is a matter committed to Congress. Thereafter, Congress acted to eliminate obstacles to construction of the pipeline with passage of the Trans–Alaska Pipeline Authorization Act ("TAPAA") in 1973.[1] That statute waived further proceedings under the National Environmental Policy Act of 1969 and directed the Secretary to issue all necessary rights-of-way and permits for construction of the Trans–Alaska Pipeline System ("TAPS") subject to the limitations of § 28 of the MLA as amended by TAPAA. Pub.L. 93–153, § 203.

Congress' desire to expedite construction of TAPS came at a time when the nation faced a petroleum shortage and was accompanied by concern over the effect exportation of Prudhoe Bay crude oil might have on domestic supplies. A pipeline built to tidewater at Valdez made exportation to Japan economically attractive for both the oil producers and the State of Alaska as royalty owner. Unfettered exportation of Prudhoe production was seen as contrary to a better provisioned domestic market.[2] Accordingly, through TAPAA's amendment of § 28 of the MLA, Congress assured that (with exceptions not here pertinent) oil transported through any pipeline authorized under § 28 would not be exported from the United States unless exportation was supported by Presidential findings that exportation would not diminish domestic supply, would be in the national interest, and would comply with the Export Administration Act of 1969 ("1969 EAA"). The legislation also provided that exportation would cease if the President's findings were disapproved by a concurrent resolution of the houses of Congress.[3]

---

1. Pub.L. 93–153, 87 Stat. 584. *See generally* Senate Report No. 93–207, reproduced at 1973 U.S.Code Cong. & Admin.News 2417, *et seq.*

2. Senate Report No. 93–207 at U.S.Code Cong. & Admin.News pp. 2417, 2431–2434.

3. MLA section 28(u), as enacted in 1973, Pub.L. 93–153, § 101. Codified at 30 U.S.C. § 185(u), this provision was amended by Pub.L. 99–64, § 123(b) in 1985 to change the reference to the 1969 EAA, which had expired in 1979, to its successor, the Export Administration Act of 1979.

The 1969 EAA expired on September 30, 1979. It was replaced by the Export Administration Act of 1979 ("1979 EAA").[4] Section 7(d) of the 1979 EAA restricting export of crude oil applies only to crude oil transported through TAPS. 50 U.S.C.App. § 2406(d). The 1979 EAA expired on September 30, 1990, but the crude oil export restrictions were continued by Executive Order 12730. In 1993, the 1979 EAA was reenacted with a June 30, 1994, expiration date.[5]

The restrictions in § 7(d) of the 1979 EAA are structured so that crude oil can be exported notwithstanding any other provision of the 1979 EAA and notwithstanding MLA § 28(u), but only under certain conditions. With exceptions not relevant here, the conditions are that the President finds such exportation (i) will not diminish domestic supply, (ii) will within three months cause specified cost reductions to refiners of which at least 75 percent is passed on to consumers, (iii) will be made only under contracts terminable upon threat to domestic supplies, (iv) are necessary to protect the national interest, and (v) are in compliance with the other provisions of the 1979 EAA. Unlike the Presidential findings required by MLA § 28(u), the findings required by § 7(d) are not independently effective. Rather, they become effective only if Congress passes a joint resolution approving them, which is then enacted into law. 50 App. U.S.C. § 2406(d)(2)(B).

## II. THE DISPUTE

Plaintiff State of Alaska sued certain officials of the United States seeking a declaration that enforcement of a federal prohibition on exportation of crude oil produced in Alaska and transported through TAPS violates Alaska's rights as a sovereign state of the Union. Coalition To Keep Alaska Oil ("Coalition") and Northville Industries Corporation ("Northville") were permitted to intervene as defendants.[6] Plaintiff's First Amended Complaint seeking declaratory and injunctive relief sets forth the following summary of the state's litigation objectives at page 4, paragraph 6:

With this Complaint, Alaska seeks (1) a declaratory judgment that the ban on export of TAPS crude oil is unconstitutional under the Tenth Amendment, Article I, section 9, clause 6 and Article IV, section 4; (2) a permanent injunction enjoining and restraining the future enforcement of the export ban; (3) a declaratory judgment that the provisions of the [Mineral Leasing Act ("MLA")] permitting Congress to disapprove, by concurrent resolution a Presidential finding to approve export of domestically-produced crude oil transported by pipelines over Federal rights-of-way, is unconstitutional under Article I, section 7, clauses 2 and 3, and a permanent injunction against any action to restrict the export of TAPS crude oil on the ground that Congress has not consented to such export under the MLA, the TAPS Act, and regulations thereunder; and (4) a declaratory judgment that the provisions of the [Export Administration Act ("EAA")] requiring Congress to approve, by joint resolution, the executive's recommendation to allow an export of ANS crude oil is unconstitutional under Article I, section 7, clauses 2 and 3, and the separation of powers, and a permanent injunction against any action to restrict the export of TAPS crude oil on the ground that Congress has not approved such export under the EAA and the regulations thereunder.

The court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III. MOTIONS PENDING

Intervenor defendant Coalition filed a motion for summary judgment at docket 27. Defendants Ronald H. Brown and Bruce Babbitt ("federal defendants") filed a motion for summary judgment at docket 28. Inter-

---

4. Pub.L. 96–72, Sept. 29, 1979, 93 Stat. 503.

5. Pub.L. 103–10, § 2, March 27, 1993, 107 Stat. 40.

6. The court has also permitted Kern County, California, to file a brief *amicus curiae*. The county's interest in the outcome of the litigation lies in the fact that much of the oil transported through TAPS is shipped to California for refining. The large quantity of TAPS oil received in California has had a substantial negative impact on the production of oil in Kern County.

venor defendant Northville elected to join in the federal defendants' motion rather than file a separate motion for summary judgment. Plaintiff filed a cross-motion for summary judgment on counts I, III, IV, and V of its First Amended Complaint at docket 72.[7] This order addresses all three motions.

Earlier motion practice and the court's order relating to defendants' argument that the statute of limitation has run on plaintiff's claims have focused the constitutional challenges raised by plaintiff on § 7(d) of the 1979 EAA to the exclusion, at least initially, of § 28(u) of the MLA.[8]

To review the statute of limitation issue briefly, 28 U.S.C. § 2401(a) provides in pertinent part:

> Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

The court found that § 7(d) of the 1979 EAA and MLA § 28(u) raise separate obstacles to exportation of TAPS crude and concluded that if the state could not clear the § 7(d) hurdle, then whether MLA section 28(u) is viable would be a moot question.[9] Because reenactment of the 1979 EAA in March of 1993 eliminated the argument that the six-year period established by 28 U.S.C. § 2401(a) had run as to that law,[10] the court concluded that consideration of defendants' summary judgment motions as they pertain to § 7(d) was appropriate before considering whether or not the statute of limitation has run with respect to challenges to MLA section 28(u). Only if plaintiff's attack on the 1979 EAA survives the motions for summary judgment might it be necessary to address issues respecting the timeliness of a challenge to MLA § 28(u).[11]

There are several arguments advanced by plaintiff which the pending motions require the court to consider. First,[12] plaintiff argues that the legislative veto provision of § 7(d) of the 1979 EAA violates the Presentment[13] and Bicameralism[14] Clauses of the Constitution and is inconsistent with a fundamental doctrinal underpinning of the Constitution, the separation of governmental powers between the several branches of the federal government. Next, the state urges that § 7(d) has the effect of preferring the ports of other states over those of Alaska, and that such preference violates the Port Preference Clause of the Constitution.[15] Next, Alaska urges that § 7(d) invades the sovereignty of

7. The State takes the position that summary judgment is inappropriate on Count II of the First Amended Complaint which seeks relief based on an alleged violation of the Guaranty Clause of the Constitution (Article IV, § 4) on the grounds that there are genuine issues of material fact which must first be decided.

8. Plaintiff's motion challenges the validity of MLA § 28(u), but in view of the disposition of the challenge to § 7(d) of the 1979 EAA, this order does not reach that matter.

9. The court read the two statutory provisions such that if exportation were approved under § 7(d), approval under § 28(u) would not be required. *See* order of June 11, 1993, at docket 55.

10. The court also rejected federal defendants' and intervenors' argument that any challenge to the restrictions on export of TAPS transported oil is subject to the time limitation in 43 U.S.C. § 1652(d), because that provision by its terms applies only to claims relating to actions taken by federal officials in connection with the issuance of rights-of-way, permits, and the like for construction and initial operation of the pipeline.

11. Even though defendants prevail on the § 7(d) issues, if the 1979 EAA is not renewed or re-placed, its expiration would render it appropriate to consider the timeliness of a challenge to MLA § 28(u) at the time of its expiration.

12. The order in which the issues are listed does not correspond to the order in which they are addressed in the parties' briefs. Rather, it corresponds to the order in which they are addressed in this order.

13. Two provisions in the Constitution require legislative actions to be presented to the President: Article I, Section 7, Clause 2, states that, "Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States." Article I, Section 7, Clause 3, provides that, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary ... shall be presented to the President of the United States."

14. U.S. Const., art. 1, § 7, cl. 2. *See also* Article I, § 1.

15. U.S. Const., art. 1, § 9, cl. 6.

the state in violation of the Tenth Amendment to the Constitution. Finally [16], plaintiff argues that restriction of TAPS oil exportation threatens Alaska's ability to function as a republican government in violation of the Guarantee Clause of the Constitution.

## IV. DISCUSSION

### A. *Summary Judgment Standards*

A well known trilogy of decisions by the Supreme Court sets out several propositions important to current summary judgment practice. First, to defeat a motion for summary judgment, the non-moving party must establish genuine issues of fact that must be resolved by a finder of fact, because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Second, when at trial the non-moving party will bear the burden of proof on an essential element of its claim, but fails to make a showing sufficient to establish a genuine dispute of material fact concerning the element's existence, summary judgment is proper. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Third, where the factual context renders the non-moving party's claim implausible, that party is obligated to present more persuasive evidence than would otherwise be necessary to show that a genuine dispute remains for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. *Presentment, Bicameralism, and Separation of Powers*

Plaintiff's challenge to § 7(d) of the 1979 EAA relies on three concepts which are closely related in a functional sense, for all are directed at so dividing the power of government that individual liberty may coexist with a federal government strong enough to address the concerns of the nation.

The three concepts are: (1) the doctrine of separation of government powers (the theory dividing the federal government's power to legislate, enforce, and interpret the law between coordinate branches of government); (2) bicameralism (which divides Congress into two houses to guard against improvident exercise of the legislative power by a single legislative body); and (3) presentment (which assures the President has an opportunity to exercise veto power over legislative acts).

To establish that § 7(d) of the 1979 EAA violates the Constitution through incompatibility with the three concepts described above, the state relies on *Immigration and Naturalization Serv. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). There, the Supreme Court dealt with a challenge to § 244(c)(2) of the Immigration and Nationality Act, then codified at 8 U.S.C. § 1254(c)(2). Section 244(c)(2) provided that either house of Congress could pass a resolution invalidating a decision by the Attorney General to permit a particular deportable alien such as Mr. Chadha to remain in the United States.

In *Chadha* the Court addressed a statutory scheme which implemented the power granted by the Constitution to Congress to provide for a uniform law of naturalization.[17] The scheme included the following features: (1) Congress established certain standards pursuant to which an alien illegally residing in the United States could obtain a suspension of deportation; (2) Congress delegated to the Attorney General the authority to administer the law providing for suspension of deportation; and (3) Congress provided that either house of Congress could, by resolution, overrule a decision by the Attorney General to suspend deportation.[18] The Court found that having delegated the power to administer a law to the Attorney General, the provision permitting either house of Congress to "veto" the Attorney General's action

---

**16.** The state also has attacked MLA § 28(u), but the court's disposition of the state's attacks on § 7(d) of the 1979 EAA renders it unnecessary to address the validity of MLA § 7(d) at this time.

**17.** Article 1, § 8, Constitution of the United States.

**18.** Sections 244(a)(1) and (c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 244(a)(1) and (c)(2), as in force at the time relevant to the decision in *Chadha.*

was legislative in character and therefore subject to, and in violation of, the Bicameralism and Presentment clauses (and, in effect, the separation-of-powers doctrine).

In the case at bar, the statutory scheme presently at issue differs from that under consideration in *Chadha*. To begin with, § 7(d) of the 1979 EAA does not delegate authority to the President to make a decision based upon specific statutory standards. Rather, § 7(d)(1) prohibits exportation of TAPS oil while § 7(d)(2) provides that the President may recommend exportation based on certain findings regarding the effect of the contemplated exportation of TAPS oil. This distinction is the antecedent to another. The statute considered in *Chadha* permitted either house of Congress to reverse the Attorney General's decision implementing the law. In contrast, under § 7(d)(2), exportation will be authorized if Congress, "within 60 days after receiving that recommendation, agrees to a joint resolution which approves such exports on the basis of those findings, which is *thereafter enacted into law*." 50 App.U.S.C. § 2406(d)(2) (Emphasis added.)

The fatal shortcomings of § 244(c)(2) of the Immigration and Nationality Act are not present in § 7(d) of the 1979 EAA. If the President were to make the findings contemplated by the 1979 EAA and deliver them to Congress, then legislation would be considered which would have to pass both houses and be presented to the President.

Section 7(d) does include a rather unusual advance request to the Executive for information which Congress deems relevant to possible legislative action. However, the 1979 EAA neither permits legislative action by a single house, nor dispenses with presentation of legislation to the President. Plaintiff's reliance on *Chadha* in its attack on § 7(d) is misplaced.[19] As a matter of legislative mechanics, the 1979 EAA does not contravene the Presentment or Bicameralism clauses, nor does it offend the separation of powers doctrine.

### C. Port Preference Clause

■ Article I, Section 9, Clause 6 of the Constitution prohibits federal regulation which prefers the ports of one state over those of another:

> No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; Nor shall Vessels bound to, or from, one State, be obliged to enter, clear or pay Duties in another.

Plaintiff argues that the prohibition on exportation of TAPS oil favors the ports of states other than Alaska over Alaskan ports. Plaintiff relies on *Pennsylvania v. The Wheeling and Belmont Bridge Co., et al*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), for the proposition that the Port Preference clause prohibits purposeful discrimination by Congress against the ports of one state, but does not limit discrimination which is incidental to the exercise of Congressional power to achieve some other purpose. This construction of the clause is consistent both with the language of the clause and with what plaintiff describes as its historical background, namely the concern of individual states to prevent the exercise of national powers over commerce and taxation to favor politically powerful states over others having less influence in Congress. Defendants do not take issue with the proposition that the Port Preference clause can act as a limit on Congressional power when that power is exercised for the purpose of favoring some states over others.

The dispute framed by the briefs is over the correct characterization of the prohibition on export of TAPS oil. Defendants and intervenors say the purpose of the prohibition is to reduce domestic dependence on foreign

---

19. The state makes much of the fact that § 7(d)(1) operates "notwithstanding" any other provision of the 1979 EAA or MLA § 28(u). The argument is that these other provisions do authorize the Executive to authorize exportation subject to specific standards making the analysis in *Chadha* applicable. The state misapprehends the effect of the word "notwithstanding" in § 7(d)(1). The inclusion of the "notwithstand-ing" clause simply makes it clear that the prohibition on exportation in § 7(d)(1) is effective no matter what the other provisions might say. Since the prohibition is found in the 1979 EAA itself, which was enacted by both houses of Congress and presented to the President, the rendering of earlier legislation ineffective is not an action which violates the Constitutional constraints to which plaintiff points.

oil. It follows, they say, that any preference of non-Alaskan ports is merely incidental. Plaintiff contends that reducing domestic consumption of foreign crude by limiting exportation of TAPS oil, while permitting export of oil from all other states, can only be seen as purposeful discrimination against Alaska.

Plaintiff's argument that the discrimination is purposeful is not supported by any statement of purpose in the statute and is contrary to the available legislative history which explains that the purpose of the legislation is to reduce domestic consumption of foreign crude oil.[20] The only evidence that the law's purpose is to disfavor Alaskan ports is the inference which may be drawn from the language of the statute which limits the prohibition to oil transported in TAPS. The difference between the 1969 EAA and the 1979 EAA underscores the inference, for the earlier statute prohibited exportation of crude oil transported through any pipeline authorized pursuant to the MLA, but the 1979 EAA narrowed the prohibition to apply only to crude oil transported through TAPS. Under these circumstances, it cannot be denied that when Congress enacted the 1979 EAA, Congress knew that the national effort to reduce domestic consumption of foreign crude oil would be accomplished solely at the expense of Alaska, for it alone among the several oil-producing states would find the lion's share of its oil production shut out of the export market.

The undisputed facts, then, would support an inference that it was Congress' purpose to favor other oil producing states over Alaska. Yet, the facts readily support the inference that Congress' purpose was neither more nor less than what the legislative history discloses—to reduce domestic dependence on foreign oil—with the attendant consequence that Alaska would be disproportionately affected being just that, a consequence, not a purpose.

That a Congress assembled in the late twentieth century would enact legislation *for the purpose* (as opposed to legislation which

has the consequence) of disfavoring the ports of one state is highly implausible. The Union has been bound too long by shared commercial, educational, and cultural experience, has become home to such a highly mobile populace, and has been so imbued with interstate connections in nearly all aspects of economic life, to admit of much plausibility in the notion that Congress would act *for the purpose* of favoring or disfavoring a particular state.

To prevail plaintiff would have to show that in passing the 1979 EAA, Congress acted not for the purpose of limiting domestic consumption of foreign oil by assuring domestic delivery of TAPS oil, but for the purpose of disfavoring Alaskan ports. Plaintiff has failed to present evidence supporting this highly implausible proposition sufficient to create an issue for resolution at trial. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

### D. *Tenth Amendment*

■ The Tenth Amendment reserves to the states and the people all powers not delegated to the federal government and not prohibited to the states by the Constitution. Congress has been delegated the power to regulate foreign commerce.[21] The 1979 EAA represents an exercise of that power. Congress possesses plenary power over foreign commerce. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974). As has been said in the context of the companion power to regulate interstate commerce:

> The power of Congress in this field is broad and sweeping; where it keeps within its sphere and violates no express constitutional limitation it has been the rule of the Court, going back almost to the foundation days of the Republic, not to interfere.

*Katzenbach v. McClung*, 379 U.S. 294, 305, 85 S.Ct. 377, 384, 13 L.Ed.2d 290 (1964).

There is no question that § 7(d) operates well within the sphere of the foreign commerce power. Plaintiff points only to the

---

**20.** *See* Senate Report 169, 96th Congress, 1st Session, at p. 14, *reprinted in* 1979 U.S.Code Cong. & Admin.News 1147, 1160.

**21.** U.S. Const., art. I, § 8, cl. 3.

general reservation of unspecified powers in the Tenth Amendment to establish a conflict between the exercise of the foreign commerce power and the Constitution. Yet, as the Ninth Circuit has said, these limits, "are structural, not substantive—i.e., [the] States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *State of Nevada v. Watkins,* 914 F.2d 1545, 1556 (9th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991) (quoting *South Carolina v. Baker,* 485 U.S. 505, 512, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988)).

Plaintiff relies on *New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). There, the Supreme Court held that Congress lacked the power to force states to take title to radioactive wastes or to exercise state regulatory power over such wastes in accordance with instructions from Congress. The Court concluded:

> Whether one views the take title provision as lying outside Congress' enumerated powers, or as infringing upon the core of state sovereignty reserved by the Tenth Amendment, the provision is inconsistent with the federal structure of our Government established by the Constitution.

—— U.S. at ——, 112 S.Ct. at 2429. Plaintiff's reliance upon *New York* in the instant litigation is obviously misguided. Enactment of § 7(d) of the 1979 EAA neither falls outside Congress' enumerated powers, nor contravenes the federal structure of the Union.

E. *Guarantee Clause*

■ Plaintiff asserts that the effect of § 7(d) is to deny Alaskans their right to a republican form of government in violation of Article IV, § 4 of the Constitution. This claim is not justiciable. *City of Rome v. United States,* 446 U.S. 156, 182, 100 S.Ct. 1548, 1564 n. 17, 64 L.Ed.2d 119 (1980); *Nevada v. Watkins,* 914 F.2d at 1559.

## V. CONCLUSION

For the reasons set forth above, the motions at dockets 27 and 28 are **GRANTED,** and the motion at docket 72 is **DENIED, PROVIDED, HOWEVER,** that this order

shall not be construed to address the validity of § 28(u) of the Mineral Leasing Act, a matter which it is not necessary to consider at this time.